# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CRIMINAL DOCKET NO. 1:13-CR-043-MR-DLH

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| ALBERT TOMES and TINA TOMES, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant Tina Tomes' "Motion To Suppress And Memorandum In Support" (Document No. 59) and the "Government's Response To Defendant's Motion To Suppress Evidence" (Document No. 86). The pending motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b), and is ripe for disposition. Having carefully considered the motion, the record, and applicable authority, as well as the oral arguments of counsel at a hearing conducted on December 5, 2013, the undersigned will recommend that the motion be <u>denied</u>.

## PROCEDURAL BACKGROUND

On June 19, 2013, Albert Tomes and Tina Tomes ("Defendants"), along with others, were charged in a 12-count Bill of Indictment with, among other crimes, conspiracy to distribute and possess with intent to distribute a quantity of "synthetic cathinones" or Alpha-PVP, a Schedule I controlled substance analogue, in violation of Title 21, U.S.C. §§ 846 and 841(a)(1). (Document No. 3). Defendants made their initial appearances on June 26, 2013. The Court

conducted Defendants' arraignments and detention hearings on this initial bill of indictment on July 8, 2013, releasing Defendants on conditions.

On August 7, 2013, Defendant Tina Tomes filed a "Motion To Suppress And Memorandum In Support" (Document No. 59).  The Government filed its "Response To Defendant's Motion To Suppress Evidence" on September 9, 2013.  (Document No. 86). Defendant Albert Tomes filed a "Motion To Join Suppression Motion Of Co-Defendant And Participate In The Evidentiary Hearing" (Document No. 83) on September 5, 2013.  Judge Reidinger issued an "Order" (Document No. 90) on October 1, 2013, granting Defendant's "Motion to Join…" (Document No. 83).  A Superseding Bill of Indictment (Document No. 106) adding additional charges and additional Defendants was filed December 29, 2013, and trial is currently scheduled for March 3, 2014.

The undersigned held a hearing on the pending "Motion To Suppress…" on December 5, 2013.  The principal issue presented by the motion is simple:  were the applications for the search warrants in this case supported by probable cause and therefore properly issued?  In the alternative, assuming probable cause was lacking as to any portion of either search warrant application, was the search nonetheless legal as falling within the Leon good faith exception?  For the reasons set forth below, these searches were lawful and the motion to suppress should be denied.

**STANDARD OF REVIEW**

**A. Standard Applicable To Motion to Suppress A Search Warrant**

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "This fundamental right is

preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." California v. Carney, 471 U.S. 386, 390, (1985). When a District Court reviews a search warrant issued by a magistrate or a superior court judge, the judicial officer's determination of probable cause is entitled to great deference. United States v. Wellman, 663 F.3d 224, 228 (4th Cir. 2011); United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004). "Thus, 'the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" Hodge, 354 F.3d at 309 (quoting Illinois v. Gates, 462 U.S. 213, 238–39 (1983)). Moreover, the Court must limit its review to considering "only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996).

In Hodge, the United States Court of Appeals for the Fourth Circuit explained the concept of probable cause necessary for the issuance of a search warrant:

> As the Supreme Court has noted, "probable cause is a fluid concept—— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527. Although noting that probable cause is not susceptible to precise definition, the Supreme Court has described it as "existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); see also Gates, 462 U.S. at 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (explaining that a probable cause inquiry involves a determination of "whether, given all the circumstances ..., there is a fair probability that contraband or evidence of a crime will be found in a particular place").

354 F.3d at 309; see also Wellman, 663 F.3d at 228 ("the relevant question is whether the known facts and circumstances were sufficient such that a person of reasonable prudence could conclude that the described evidence would be found in that particular place."). As the Fourth

Circuit and Supreme Court have explained, there is no bright-line rule as to what specific information a search warrant application must include, and officers may decide to include a variety of information when submitting an application to a magistrate. Wellman, 663 F.3d at 228. Instead, the Court must review the application in its entirety and determine whether it provided sufficient information to support the issuance of the search warrant in question. Id.

**B. Standard Applicable to the Leon "Good Faith Exception"**

The Fourth Circuit addressed the good faith exception adopted in United States v. Leon, 468 U.S. 897 (1984), at length in United States v. Williams, 548 F.3d 311 (4th Cir. 2008).

> As the Supreme Court instructed in Leon, "a court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonable well trained officer would have known that the search was illegal despite the magistrate's authorization.'" United States v. Bynum, 293 F.3d 192, 195 (4th Cir. 2002) (quoting Leon, 468 U.S. at 922 n.23, 104 S.Ct. 3405, 82 L.Ed.2d 677). The Leon Court explained "that the deterrence purpose of the exclusionary rule is not achieved through the suppression of evidence obtained by 'an officer acting with objective good faith' within the scope of a search warrant issued by a magistrate." United States v. Perez, 393 F.3d 457, 461 (4th Cir. 2004) (quoting Leon, 468 U.S. at 920, 104 S.Ct. 3405, 82 L.Ed.2d 677). "Hence, under Leon's good faith exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'" Id. (quoting Leon, 468 U.S. at 922, 104 S.Ct. 3405, 82 L.Ed.2d 677).
>
> The Leon Court admonished that searches conducted "pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (internal quotation marks omitted). An officer's reliance on a warrant would not qualify as "objectively reasonable," however, in the following four circumstances:
>
> > First, where "the magistrate or judge in issuing a warrant was misled by information in an affidavit

that the affiant knew was false or would have known was false except for his reckless disregard of the truth," Id. at 923, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677;

Second, where "the magistrate acted as a rubber stamp for the officers and so 'wholly abandoned' his detached and neutral 'judicial role,' " Bynum, 293 F.3d at 195 (quoting Leon, 468 U.S. at 923, 104 S.Ct. 3405, 82 L.Ed.2d 677);

Third, where a supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," Leon, 468 U.S. at 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (internal quotation marks omitted); and

Fourth, where "a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid," Id.

"In any of these four circumstances, then, the Leon good faith exception does not apply." Perez, 393 F.3d at 461.

Williams, 548 F.3d at 317–318.

## DISCUSSION

### A. Summary of Affidavits

As stated above, the duty of the reviewing court in a case such as this is simply to ensure that the magistrate judge who issued the warrant had a substantial basis for concluding that the application was supported by probable cause. Hodge, 354 F.3d at 309. The reviewing court must limit its review to the sworn information presented to the magistrate judge. Wilhelm, 80 F.3d at 118. In the case of both search warrants at issue here, the sworn affidavit submitted in support was presented by DEA Agent Clayton W. Haines. The contents of these affidavits, which are of course closely related, drive the result here – that these search warrants were

5

supported in all respects by probable cause. The documents of course speak for themselves, though a summary of the highlights seems appropriate.

1. The December Search

In the first affidavit, Agent Haines sought a warrant to search Pandora's Dreams, a business located in Spruce Pine, North Carolina, and a residence located on Laurel Cove Road in Bakersville, North Carolina. Haines sets forth his law enforcement experience – namely, that he had been employed as a DEA agent since 2005, and that prior to that time, he was a Louisiana State Trooper from 2003 to 2005. Among other things, Haines represents that he "has been involved in numerous, long-term, complex investigations involving the possession and distribution of . . . synthetic cathinones – more commonly known as 'bath salts.'" At paragraphs 5(a) through 5(t), Haines sets forth what he knows generally about trafficking in drugs and synthetic drugs based on his training and experience. Specific to synthetic drugs, Agent Haines asserts within this portion of the affidavit as follows:

> That drug traffickers involved with synthetic drugs market their products to the public as "legal." Many of the synthetic cathinones/stimulants have packaging that reads, "Not for human consumption." This packaging is an attempt to circumvent federal and state narcotics laws, such as the Analogue Statute. Additionally, I know from training and interviews with users that these traffickers will call their products "insect repellent," "anti-itch powder," or "glass cleaner" to disguise the true use of the synthetic drug.

In the portion of the affidavit specifically noted as regarding probable cause, Haines alleges as follows:

- Law enforcement is investigating a number of individuals and entities, including Tina and Albert Tomes, for distributing synthetic stimulants/cathinones, more commonly known as "bath salts;"

- Synthetic stimulants/cathinones are "designer drugs" that are sold in powder and pill form as "bath salts," "bath powder," "anti-itch powder," "glass cleaner," and "insect repellent," and their effects have been described as being similar to those caused by other stimulants such as methamphetamines, MDMA (ecstasy), and cocaine;

- A controlled substance analogue is defined in 21 U.S.C. § 802(32), and a controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law, as a controlled substance in Schedule I. Alpha-Pyrrolidinopentiophenone (a-PVP) is a controlled substance analogue;

- Tina Tomes paid for an Individual Business License on April 20, 2012, and listed herself as the owner of Pandora's Dreams on her Facebook page;

- Investigators conducted undercover purchases of synthetic cathinones and a purchase of drug paraphernalia from Pandora's Dreams between October 2012 and November 2012;

- Specifically, an undercover officer assigned to the DEA Task Force purchased a glass smoking pipe and three packages of "glass cleaner" from Pandora's Dreams on October 31, 2012. The DEA lab found that this substance tested positive for a-PVP, which shares substantial chemical structural similarities with MDPV, which is a Schedule I controlled substance;

- On November 5, 2012, an undercover officer assigned to the DEA Task Force purchased one package of "anti-itch powder" and one package of "insect repellent" from Pandora's Dreams. The DEA lab found that these substances tested positive for a-PVP, which shares substantial chemical structural similarities with MDPV, which is a Schedule I controlled substance;

- On December 6, 2012, an undercover officer walked into Pandora's Dreams and confirmed that the store was still selling synthetic cathinones, including "insect repellent" and "anti-itch powder;"

- An interview was conducted on November 3, 2012 with a Confidential Source ("CSI") who had firsthand knowledge of Pandora's Dreams and how it operated. The CSI was employed at Pandora's Dreams until recently when he/she was terminated. The CSI stated that Tina Tomes knew that the chemical in these products was illegal;

- This same CSI also stated that Tina Tomes made about four to six thousand dollars per day selling these products; that she did not keep the products in the store at night due to previous break-ins; and that she kept a firearm in the store for her personal protection;

- This CSI has a prior criminal record but is considered by law enforcement to be reliable and credible;

- On two separate occasions – November 7, 2012 and December 11, 2012 – law enforcement conducted surveillance at Pandora's Dreams as Tina and Albert Tomes departed at closing time. On each occasion, the Tomes departed with bags they carried out of the store. Upon arriving home, they brought one or more of these bags inside their home.

2. <u>The January Search</u>

In the second affidavit, Agent Haines sought a warrant to again search Pandora's Dreams in Spruce Pines and the residence located on Laurel Cove Road in Bakersville, and also an outdoor storage shed located near the residence on Laurel Cove Road. The affidavit re-alleges in nearly identical fashion all of the allegations of the first affidavit, though occasionally in slightly more concise or summary form. This includes the identical legal basis for asserting that a-PVP, a controlled substance analogue, is an illegal Schedule I controlled substance.

Moreover, Agent Haines makes additional allegations, some of which involved events subsequent to the issuance of the first warrant, including:

- During law enforcement surveillance on November 7, 2012, law enforcement observed unknown individuals place items inside an outdoor storage shed at 164 Laurel Cove Road in Bakersville, NC;

8

- On December 17, 2012, law enforcement executed the first search warrant at both the business and the residence. Law enforcement seized $26,669 in U.S. currency and bulk synthetic cathinones that the Tomes called "Dragon;"

- In a post-<u>Miranda</u> interview, Tina Tomes stated that she ordered bulk synthetic cathinones powder and packaged it herself into packages labeled "Bushman's Insect Repellent" and "Monkey Butt Anti-Itch Powder." She sold this along with pre-packaged "Dragon" insect repellent, and said that all three were the same and came from the same source of supply;

- Tina Tomes provided to law enforcement a laboratory report of the "Dragon" powder that was given to her by the source of supply, stating that the analysis detected a-PVP, a controlled substance analogue. She stated to law enforcement that she would stop selling "Dragon;"

- Tina Tomes stated that she was then purchasing on a lease to own arrangement both 164 and 181 Laurel Cove Road in Bakersville, NC. These properties consisted of two trailers and three out buildings;

- Pandora's Dreams had at the time of the affidavit a Facebook page, which contained a "status" section. As of January 2, 2013, and January 7, 2013, that "status" section contained material suggesting that the store obtained a new supply of "Dragon" and was once again selling it to customers;

- On January 7, 2013, law enforcement in Spruce Pines, NC received a call about an intoxicated driver. Subsequent to the arrest of the driver, a package of "Dragon" was located inside the car. The driver stated that his passenger had asked him to drive from Tennessee to Pandora's Dreams to buy "Dragon." Both the driver and the passenger stated that "Dragon" was purchased <u>that</u> <u>night</u> from Pandora's Dreams;

- On January 9, 2013, law enforcement again conducted surveillance of Tina and Albert Tomes as they closed the store. As before, they carried items from the store to their vehicle and then drove directly to the area of their

> residence. Albert Tomes placed something inside the shed
> at 164 Laurel Cave Road. Albert Tomes and Tina Tomes
> also each carried items into their residence.

**B. December Search of the Business and the House**

The standard to be applied here is clearly set out above and will not be repeated here. With regard to the first affidavit and the proposed search of Pandora's Dreams, it is self-evident that probable cause existed. Law enforcement conducted multiple undercover purchases from the store in October and November of 2012. Specifically, on October 31, 2012 and November 5, 2012, an undercover agent assigned to the DEA Task Force purchased a glass smoking pipe and a total of five (5) packages of synthetic cathinones packaged under different names from Pandora's Dreams. These substances were submitted to the DEA lab, which found that these substances were a controlled substance analogue, in that they tested positive for a-PVP. A-PVP shares substantial chemical structural similarities with MDPV, which is a Schedule I controlled substance.

There is also ample probable cause set forth for the first search of the residence on Laurel Cove Road. A confidential informant deemed "reliable and credible" told law enforcement that Tina Tomes knew that the chemical in the products being sold was illegal, and that she and Albert Tomes would package the material themselves. The informant stated that the Tomes did not keep the product at the store at night due to break-ins. On November 7, 2012, and December 11, 2012, law enforcement surveilled the Tomes as they left the store at closing time. On each occasion, law enforcement observed them carrying bags out of the store and placing them in their vehicles. They then went to their home on Laurel Cove Road in Bakersville and were observed carrying bags into the residence. The affidavit also contains more general allegations about drug

offenders – including their habit of keeping their drugs in close proximity, including in their home.

The Court notes that counsel for Ms. Tomes took the position at the December 5, 2013 hearing that his client had committed no criminal offense, and probable cause fails here for that reason. Counsel is free to present this argument in a dispositive motion, or at the close of government's evidence at trial, but the undersigned finds that the affidavit contains a sufficient allegation that federal law makes these substances illegal. In any event, there is no question that probable cause existed for the first search of the store and the residence.

## C. January Search of the Business, the House and the Shed

The second search of Pandora's Dreams was likewise clearly supported by probable cause. Against the backdrop of all the facts supporting the first search (which are re-alleged), Agent Haines alleges new facts arising from subsequent events. The first search yielded a large amount of United States currency and bulk amounts of synthetic cathinones that Tina Tomes called "Dragon." Ms. Tomes made damaging statements to law enforcement, including that she ordered bulk synthetic cathinones powder, packaged it herself, and sold it as "Dragon," "Bushman's Insect Repellent," and "Monkey Built Anti-Itch Powder;" and that she would immediately stop selling "Dragon." Notwithstanding, the "status" section of the Pandora's Dreams Facebook page contained material on January 2, 2013 and January 7, 2013 strongly suggestive that Pandora's Dreams was again selling "Dragon." Not coincidentally, Spruce Pine, NC law enforcement stopped a Tennessee driver for impaired driving on January 7, 2013, who subsequently stated he and his passenger had bought "Dragon" at Pandora's Dreams that very evening. All of this together clearly constituted probable cause for the second search of the business.

Similarly, the affidavit alleges ample facts to allow a second search of the Tomes' residence. In addition to the re-alleged facts from the first affidavit, and the new facts summarized immediately above, there are additional allegations regarding what might be found at the residence. On January 9, 2013, as they had done in October and November of 2012, law enforcement conducted surveillance of the Tomes at closing time at the business. As they had done before, the Tomes carried bags out of the business, and upon arriving at their residence, appeared to carry the bags inside the residence. Particularly in light of the statements of the informant that Tina Tomes knew these materials contained a chemical that was illegal and that Tina Tomes stated to the informant that she did not keep these materials in the store at night, this new surveillance information is compelling. Probable cause supports the second search of the Tomes' residence.

While not as strong a showing, in light of all the facts alleged, there is also probable cause to support the search of the shed. Again, it is worth noting that the context here is all of the information in the first affidavit, and the other information summarized above in terms of events subsequent to the issuance of the first search warrant. With this as context, the second affidavit alleges two occasions on which law enforcement observed materials being placed in the shed at 164 Laurel Cove Road. On the first occasion, the persons involved were not identified; on the second occasion – January 9, 2013 – law enforcement observed Albert Tomes placing something in the shed on the way to the Tomes' nearby residence while coming home from the store. Tina Tomes stated during an interview that she was then leasing to own both 164 and 181 Laurel Cove Road, and the shed was therefore near her own residence. Taking into account <u>all</u> the facts alleged, there was probable cause to support the search of the shed, albeit less than for the store and the Tomes' residence.

**D. The <u>Leon</u> Good Faith Exception**

The undersigned concludes that probable cause as set forth in Agent Haines' affidavits supports all of the searches at issue. Resort to the <u>Leon</u> good faith exception is not necessary, in the opinion of the Court. However, out of an abundance of caution, the Court notes that should another court find probable cause lacking for any of the searches, the <u>Leon</u> good faith exception applies, defeating in the alternative the Defendants' motion to suppress.

"Under <u>Leon's</u> good faith exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'" <u>United States v. Perez</u>, 393 F.3d 457, 461 (4th Cir. 2004) (quoting <u>Leon</u>, 468 US at 922, 104 S.Ct. 3405, 83 L.Ed. 2d 677). As set forth above in the section of this order related to the standard of review, there are four circumstances in which an officer's reliance on a warrant would not qualify as "objectively reasonable." These situations, simply put, are when the magistrate was misled by information the affiant knew was false; when the magistrate acted as a rubber stamp and abandoned his judicial role; when the affidavit is so lacking in probable cause as to render official belief in it entirely unreasonable; and when the warrant is so fatally deficient in certain particulars that the executing officers cannot reasonably presume it is valid. None of these circumstances even remotely applies here.

## CONCLUSION

The question for the Court is whether probable cause supported the issuance of these search warrants. A careful review of the affidavits presented to the magistrate judge make it apparent that the answer is yes. Assuming <u>arguendo</u> that there was inadequate probable cause as to any of the searches, the <u>Leon</u> good faith exception applies. On these alternative bases, the motion to suppress should be denied.

**RECOMMENDATION**

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Defendants' "Motion To Suppress And Memorandum In Support" (Document No. 59) be **DENIED**.

**TIME FOR OBJECTIONS**

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenhour, 889 F.2d 1363, 1365 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), reh'g denied, 474 U.S. 1111 (1986).

Signed: January 9, 2014

David C. Keesler
United States Magistrate Judge